## REESE v. MAYFIELD CO. (No. 8576.)

(Court of Civil Appeals of Texas. Dallas. Oct. 15, 1921.)

1. Trial &#8787;142 — Directed verdict improper where contradictory conclusions could be drawn from evidence.

A court commits error to direct a verdict, where contradictory conclusions might be drawn from the evidence, whatever conclusion it may establish in the mind of the judge.

2. Deeds &#8787;78—Whether signatures of grantors obtained by fraud held for jury.

In trespass to try title, the issue whether signatures to the deed under which plaintiff claimed were obtained by fraud practiced on the grantors *held* for the jury.

3. Acknowledgment &#8787;62(2)—Whether grantors appeared before notary held for jury.

In trespass to try title, whether the grantors in deed to plaintiff appeared before a no-

tary public for the purpose of giving their acknowledgment to which the notary's certificate was attached *held* for the jury.

**4. Mortgages ⬡➡39—Deed or mortgage held for jury.**

In trespass to try title, whether deed under which plaintiff claimed was a deed or mortgage, as respects the claim that it was invalid as a mortgage of a homestead, *held* for the jury.

Appeal from District Court, Wood County; J. B. Warren, Judge.

Action by the Mayfield Company against Roscoe Reese. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

Jones & Jones, of Mineola, for appellant.

Simpson, Lasseter & Gentry, of Tyler, for appellee.

HAMILTON, J. Appellee sued appellant in trespass to try title, making the allegations usual in cases purely of this nature. Appellant answered by general denial, plea of not guilty, and the following special pleas: The statutory five-year period of limitation; that the title relied upon by appellees was a deed which was never acknowledged by the grantors therein, who were husband and wife, and that, while the land which such deed purported to convey was the grantors' homestead, the wife never acknowledged the deed privily and apart from her husband; that the grantors in the deed to which appellees looked to support their claim of title were old and illiterate, and that, if such deed really bore their signatures, the signatures were obtained without either one knowing the instrument to be a deed to their home, and that, through deceit and misrepresentation practiced upon them by the notary public and appellee's agent as to the nature of the instrument, they were induced to execute it in ignorance of its tenor and import. Appellant alleged that the deed to Mayfield Company was without any consideration, even if it was signed by the owners (who were appellant's parents), because the deed purported to convey a homestead to appellee in consideration of credit upon a past-due debt, owing to appellee by a partnership of which appellant's father, one of the grantors in the deed to appellee, was a member. As a further defense pleading it was alleged under oath by appellant that the deed relied upon by appellee was fraudulent and a forgery executed without the knowledge and consent of the purported grantors therein, to wit, L. H. Reese and wife, L. F. Reese, respectively, father and mother of appellant.

The court at the conclusion of the evidence directed a verdict for appellee, and from a judgment accordingly entered comes this appeal.

The case is presented to us upon several assignments of error, the aggregate effect of which is that the peremptory instruction was erroneous.

[1] We are inclined to the view that the cause should have been submitted to the jury. It is well settled that a court commits error to direct a verdict where contradictory conclusions might be drawn from the evidence, whatever conclusion it may establish in the mind of the judge. So it has been held to be error to instruct a verdict, even in a case where there is no conflict among the witnesses, if more than one conclusion might be derived from the evidence. Mitchell v. McLaren (Tex. Civ. App.) 51 S. W. 269.

The record contains evidence to this effect: That L. H. Reese and his son, John Reese, were engaged in the mercantile business at Hawkins, Tex., in January 1914; that they were partners; that John Reese had active control of the business to the exclusion of his father, who knew practically nothing about it; that the business was in a failing condition; that the partnership was indebted to appellee, and that bankruptcy was impending; that these things were discussed between John Reese and appellee's agents; that the latter promised John Reese, in effect, that if he would induce his father and mother to execute a deed conveying their rural homestead, consisting of about 50 acres, to appellee, appellee would, before bankruptcy, credit $1,250 on the indebtedness the partnership firm owed appellee, and would extend John Reese a line of credit when bankruptcy proceedings were over, and start him in business again; that a deed conveying the homestead of L. H. Reese and wife to appellee was prepared by the agents and officers of the latter, and delivered to John Reese for the purpose of his obtaining his parents' execution of it; that John Reese, accompanied by a notary public, called at the home of his father and mother on a Sunday soon after receiving the deed, and that immediately thereafter it was returned to appellee bearing the signatures of L. H. Reese and wife by their respective marks, followed by the statutory certificate of acknowledgment. This deed was placed of record, but appellee for more than six years thereafter made no overt and adverse claim of possession against L. H. Reese and wife, and in no way attempted to assert any control over or right in the premises with their knowledge, although they continued to live upon, use, and enjoy it as their own until the 27th day of January, 1919, when they conveyed it to appellant. One and one-half years thereafter appellee asserted its title against appellant.

We will state in this connection that, although the witness Porter, one of appellee's officers, testified that five acres of the land at a date not mentioned was sold by appellee to a Mr. Farmer, there is no proof as to how

the sale was made, nor does the record show that L. H. Reese's attention was ever brought to a transaction of this kind. On the contrary, it appears from the record that L. H. Reese understood that the transaction was one between Farmer and W. H. Reese, and that a mule was taken in payment or part payment for it, and delivered to L. H. Reese, or at least used on his farm in cultivating it. He testified that he never heard anything about the conveyance being made by Mayfield Company until this fact was testified to at the trial.

The fact is undisputed that L. H. Reese and his wife were aged and illiterate, both of them being more than 70 years old, and neither of them being able to read and write. It also appears from the record without dispute that the partnership went into bankruptcy following the delivery of the deed to appellee, and that appellee credited to its account the sum of $1,250, the amount John Reese and appellee's officers agreed should be credited thereon in consideration of the conveyance, and proved its account in bankruptcy for the balance. While testifying in appellee's behalf, J. W. Reese swore that at the time the deed was made it was agreed between him and appellee that upon payment of $1,250 appellee would reconvey the land.

We deem it proper in view of the contentions made, to set out in full the testimony offered in appellant's behalf. It consisted of that of his father and mother, Mr. and Mrs. L. H. Reese, and that offered by himself.

L. H. Reese testified as follows:

"My name is L. H. Reese, and I live at Hawkins, and have lived there nearly 12 years. I will be 76 years of age the 8th of next May. I think there was 160 acres in the whole tract of land that I bought down there from Jack Brown, and there was a house on part of the land. The land was on both east and west sides of the road, about 3 or 4 acres on the west side. There is a little more land besides the place where the house is I am living in; there is about 3 acres where the colored man lives, and we have about 1½ or 2 acres on the site where my house is. There is maybe 6 acres all told on the west side. My occupation has most always been farming when I was able to work. No; I never did anything else besides farm. No; I did not farm after I moved to Hawkins. The boys cultivated some land, but I had nothing to do with it. The younger boys lived there at my home with me and cultivated some of the land. Some of them were minors. I have farmed none since I came to the county, but I had some minor boys there and they farmed. Yes; I am acquainted with the land in controversy, the land we sold to Roscoe. Some of that land is in cultivation, and maybe it all is; I am not positive. I had it cultivated up to the time we let Roscoe have it; the boys cultivated it and paid rent on it, and I had nothing in the world to do with it, hardly at all. I had nothing to do with the store, only just when I wanted something to eat I went down there and got it, and I don't know much more about it

than you did, because I did not have any education and did not know anything about the mercantile business, and I just let the boys run it. I have at various times sold off part of that land. We sold off a good block of it. I did not sell the land I let Roscoe have to anybody else. I did not sign a deed to that land to anybody else, not to my understanding I did not. I never did tell anybody to sign my name to a deed to that place. I did not tell John to sign my name to a deed. I might have told him to sign to some little instrument in writing, but never knowing it was a deed, and there was never no deed read to me. Nobody read a deed to me to that place. Jeff Giles never read any deed to me. Jeff Giles never did as I know of, bring any deed there for me and Mrs. Reese to sign. I was not paid anything for the land. Mayfield never paid me anything for the land. He never paid me any money for the land. We did at one time own some land out in Scurry county. After we moved back to Hawkins we never owned any other land except this Jack Brown land. Mrs. Reese never did, as I know of, sign any deed that Jeff Giles brought there to that land. Jeff Giles never did at any time send me out of the room and leave Mrs. Reese in there."

Cross-examination:

"Yes; Mr. Jones kept asking me if I signed a deed. Q. You understood it was a kind of instrument or paper; you did not know it was a deed? A. No; I don't know as I recollect. I never understood by that paper that we were to get the land back when Reese & Co. paid this amount to Mayfield; there never was such; they never hinted at such a thing. No; there was nothing said by me or John Reese about that. Yes; I was a member of the firm of Reese & Co., or was supposed to be. I am asked if I knew that we owed Mayfield anything; I don't know no more about what the store owed than you did, not a bit in the world. I do not remember about Jeff Giles and John Reese coming down there to the house with a paper. I did not say I did remember about that, and that Jeff Giles never did send me out of the room; I don't recollect of them ever being there together. I don't recollect Jeff Giles coming down there with a paper; he might have come down one time. He come a time or two; that is all I recollect of Jeff coming there with a paper. It is not my testimony before the jury that John Reese forged my name to that paper. I don't say that at all. I don't say that. If he signed it, he signed my name and me not knowing what the paper was. No; I was not there when he signed it, and did not make my mark. I don't recollect a thing in the world about it. Q. Do you recollect that you did not make your mark? A. I don't recollect a thing about it. Q. You don't recollect a thing about it; your mind is just a blank on it; that is the way you get around it? A. Yes, I don't recollect a thing in the world, just like I told you. I did not try to keep up with the business. He would come heaps of times—(interrupted). Once in a while he did come with papers for me to sign. Q. And you would go ahead and tell him to sign them, and that is about the way the thing was run? A. Just about the way it was run. I write my name on a little common instrument,

sign little common papers, any check or something, any little thing, but any piece of instrument or writing which would be hereafter I would get somebody else to sign my name, such as a deed or something that way, and many times I don't sign my name at all. Here lately I don't see well enough, and my hand is tore up so I don't write any at all. No; I never talked to Mayfield anything about this. I never saw Mayfield that I know of till this morning, not to know him. Not as I know of they did not sell part of this land off. Yes; they sold a piece off there to a man named Farmer, and Farmer is now occupying it. Farmer was occupying it. My understanding was John sold that land to Farmer for himself; that is the way my understanding was. No; I never made any deed to Farmer; John made a deed. No; I do not know that Mayfield Company made the deed to Farmer. I never heard of that before in my life till I come here; that is the truth. John got a mule, and that mule stayed there among the family, and the money I thought went in the store. I thought the mule come from Farmer. Farmer kept saying what a good mule it was, and so I never knowed anything about that till I come here. No; I have not tried to take the land back from Farmer. That store was all mine originally; it was practically all mine; that was the understanding that it was all mine. John just went there to manage it, and he bought and sold and collected and paid, and I had no more to do with it than you did. It is the truth that I really put the money in it to start it, and whatever profit would have been made in the store would have been coming to me after they got their pay for their trouble. The name of the firm was L. H. Reese & Sons, and the 'Sons' were John and Tom and Roscoe, several of the boys; it was understood as the 'Sons' and Roscoe worked in there when they needed him."

Mrs. L. F. Reese gave the following testimony:

"My full name is Louisa Flurrentine Reese, Mrs. L. F. Reese. I was 70 years old the 11th day of last August. I lived at Hawkins, and in January we will have lived there 12 years. I have lived at the same place ever since I moved to Hawkins. We bought that place from Jack Brown, a colored man. I don't recollect how many acres of land we bought from him originally. The land was on both sides of the road. Some of the land was in cultivation when we went there, and we have put some more in cultivation since them. Roscoe and the rest of the boys have cultivated the cultivable land since we have lived there, and they have cultivated it every year so far as I know or recollect. No; for the last 6 years we have owned no other land than that land there in Hawkins. No; I never did at any time sign any deed to Mayfield or Starr-Mayfield or anybody for that piece of land across the road, I don't remember signing no deed at all. If we ever got any money or anything out of the sale of land to Mayfield, I don't know nothing about it; I don't know nothing about the business, how they carried it on. No; I got no money out of the sale of this land we afterwards let Roscoe have. If I ever authorized anybody to sign my name to a deed to my home, I did not know it was a deed; they never read it to me,

and, if I did, I don't recollect. No; nobody ever read any deed to me to that land. Yes; I knew Jeff Giles in his lifetime. He is now dead. No; I never at any time signed any paper at the suggestion of Jeff Giles; if I did, it has slipped my memory. I don't recollect nothing about it. Yes; I remember him being at the house on some occasion; he has been there, but I don't recollect his business nor nothing about it."

Cross-examination:

"Q. Mrs. Reese, I understand your mental attitude in this matter is that you just don't remember anything about it? A. Well, I don't remember. I have just told you what I recollected anything about. I don't know nothing about their business transactions. When we let Roscoe have this place he was to see to our support, was my understanding. I am asked what my understanding was as to whether or not we were to get the place back on the payment of $900 or $1,200, at the time when John Reese came down there to the house with these papers. Well, I don't recollect nothing about that; don't know nothing about it. No; I don't know anything about that. Q. You don't recollect anything about it? A. I don't know anything about it. Yes; John was transacting the business up there, and my husband was a member of that firm. L. H. Reese, my husband, never stayed around the store there much; he generally stayed at the house. I don't remember nothing about on one Sunday when Jeff Giles and John Reese came down to the house with a paper. No; I do not say that they did not come; if they come, I don't remember it. Yes; I just don't remember; that is my attitude, the best of my recollection; I don't remember; I just don't remember. I had heard about that the firm owed the Mayfield Company, but I did not know anything about it. Q. Well, at this time didn't you know that they owed Mayfield Company? A. I didn't know a thing about their business. No; I did not know anything about their business. Q. And you just did what the woman usually does; whatever the husband says do, you went ahead and did it? A. That's all I know about it."

Redirect examination:

"If anybody ever asked me to sign a deed to the home place, I am about it like I am by the rest; I don't recollect it if they did. No; Giles never read me any deed; nobody never read me no deed. No; Giles never had my husband to leave the room while he explained anything to me. We afterwards deeded the land to Roscoe for him to see to our support. He lives there close to us, just right across the road."

Recross-examination:

"I don't recollect it if Jeff Giles and my son John came down there to the house; they might have come, but I don't recollect it. I won't say they did not. No; I don't remember that Mr. Giles was down there when a paper was signed and that he talked to me about it; I don't recollect nothing about it. No; I would not say that did not happen or that it did; I would not say that it did not."

Roscoe Reese testified for himself as follows:

"My name is Roscoe Reese. I live at Hawkins, and I came there at the same time my father and mother did. Nobody but us boys cultivated this land in controversy since my father bought it. Yes; we were all living there without parents at the time. I expect the younger one, Clifford, is now about 24 or 25 years old, No; he does not still stay there at home. I expect it has been about three or four years since he stayed there, but he stayed there up till that time. Yes; this land was cultivated every year. Yes; I am acquainted with the land as it lay on the ground. My attention is directed to a deed to me calling for 10 and a fraction acres of land, described as follows: 'Beginning at the southeast corner of a tract of land sold to C. W. West out of the George Brewer survey by L. H. Reese.' Yes; I know where that beginning point is. 'Thence north 19 west 560 varas, a stake for corner.' I know where that is. 'Thence north 107 varas a stake for corner.' Yes; I know where that is. 'Thence south 19 east 560 varas a stake for corner; thence west 107 varas to the place of beginning.' Yes; I know where that is. No; my house is not on that piece of land; it is on the same land, but it makes a little neck. Yes; since I bought this 10 acres of land I have cultivated it every year. The crops I have got on it are corn and cotton and peanuts. It is fenced, or part of it is fenced. I have a little strawberry patch and fenced about 4 acres of it. Yes; I have cultivated it every year and paid the taxes on it each year as they accrued. I knew nothing about this man Farmer getting some 5 acres off of the northeast corner over there till about three years ago. I don't know just how he paid for it, except I know he let us have a mule in on it, and I allowed maybe he paid the rest of it in money. My brother Tom bought the mule from John and swapped him off for a big iron gray mare. We worked that mule while we had it there. We kept him there for two or three years and worked him. He stayed there at my father's house a while, and my brother run a livery stable, and he stayed down there at the stable a while. I expect we kept him and used him two years. I made one crop with him on the place. * * * No; I don't reckon I have had any conversation with John Reese with reference to this matter since this suit was filed. Prior to the time of the filing of the suit I think I had some conversation with him with reference to the transaction, but I don't remember. Yes; he stated this to me in that conversation, that he was present, and that Giles did not take either one of their acknowledgments, and that both the father and mother stayed in the room all the time they were there."

John W. Reece, a witness for appellee, testified in effect that the contents of the deed were not disclosed to his father and mother at the time he signed their names to it and had them make their marks, and that he "guessed" they really did not know what they were signing. He further testified that he did not "suppose" the notary public took the acknowledgment of either his mother or father; that, if the deed was read to his father and mother, he "never heard of it,

and was there all the time"; that he himself did not read it to them and did not think he told them what it was; and that he did not hear the notary public tell them what it was.

Appellant submits that the following issues were raised by the evidence and ought to have been submitted to the jury: First, the issue of whether or not L. H. Reese and wife acknowledged the deed appellee asserted they executed to it in January, 1914; second, whether or not they signed the deed or authorized another to sign their names to it; third, whether or not the deed to appellee was in fact a mortgage upon the homestead of L. H. Reese and wife.

To the propositions advanced for support of the foregoing contentions, appellees, in effect, oppose these propositions: First, that a certificate of acknowledgment is conclusive of the facts it recites, unless fraud or imposition, in which the grantee participated, or of which he has knowledge, is alleged; second, that the burden of impeaching a certificate of acknowledgment can be discharged only by clear, cogent, and convincing proof; third, that the certificate of acknowledgment is conclusive in the absence of fraud or imposition unless the evidence clearly shows that the grantor wholly failed to appear before the notary public; fourth, that a credit on an antecedent debt is sufficient to support a bona fide sale of property; fifth, that the evidence in this case presents no issue of principal and agent as between appellee and J. W. Reese, as contended by appellant; sixth, that the issue of forgery is not raised by the evidence.

To admit the correctness abstractly of all the propositions advanced by appellee, we think, in view of the allegations and evidence, would not affect the soundness of our conclusion on the case. We think fraud and imposition, participated in by appellee, are clearly alleged. The issue of fraud and imposition participated in, or at least induced and connived at, by appellee was raised by the evidence.

We are inclined to the view that the evidence above mentioned might sustain a finding that J. W. Reese represented appellee, with its express authority, in obtaining the deed from L. H. Reese and wife. If so, then he was its agent, and his acts were its acts in the transaction. The fact that the transaction related altogether to acquiring L. H. Reese's homestead as a credit on a debt due appellee by the partnership of which J. W. Reese was a member does not, we believe, preclude the submission of the issue as to the relation of principal and agent between appellee and J. W. Reese.

While the purpose sought was to effect a credit on the indebtedness to appellee owed by a partnership of which J. W. Reese was

a member, yet he was not in the attitude of serving the partnership in seeking the execution of the deed. He was the exclusive manager of the partnership. It was approaching bankruptcy, and a definite understanding existed on the part of J. W. Reese that obliteration of the business and all its debts in bankruptcy was imminent whether or not the land was deeded as a credit.

The witness Porter testified that the agreement with J. W. Reese might have been that after bankruptcy appellee would put J. W. Reese back in business if he would get the deed from L. H. Reese and wife. It appears to be a fact that after bankruptcy appellee did this very thing. In the presence of such situation it cannot reasonably be said that J. W. Reese was seeking to obtain any benefit to the partnership business, but, on the contrary, the fact must be recognized that he was seeking to save appellee the loss which the $1,250 portion of the account would have entailed for appellee in the bankruptcy proceedings recognized by both appellee and J. W. Reese as approaching, and which did in fact come within a short time after the deed was executed. And what expected compensation prompted the action of J. W. Reese? Not necessarily, under the record before us, the satisfaction of being just, or a desire to save his creditors from the losses to them incident to the bankruptcy of the business; not to satisfy a desire on the part of his parents to reduce a partnership debt by sacrificing as a credit upon it, their exempt property. In our view the evidence rather suggests that the consideration upon which he acted was the promise that he himself would be established in business again through the aid to be extended by appellee. The acts of J. W. Reese altogether exclude the idea that they involved any service for or on behalf of either L. H. Reese and wife or the partnership. The evidence as a whole was such that a jury might find that he was procuring an advantage and benefit solely for appellee at its instance, for a consideration promised exclusively to himself. This advantage was not moving from him or the partnership. It exclusively encompassed the sacrifice of his parents' exempt property upon a firm debt about to be extinguished in bankruptcy, which appellee must have anticipated. Had the bankruptcy already occurred and discharges had already been obtained, then certainly he would have been appellee's agent in obtaining the deed under the circumstances.

[2, 3] A conclusion might reasonably be deduced from the evidence that both his and appellee's participation in the matter was in view of and in relation to the consequences of the expected bankruptcy; and, as we see it, the relation between him and appellee as to agency is little, if any, different from what it would have been had the bankruptcy proceedings already terminated. But, aside from fine distinctions as to how and whether or not J. W. Reece was appellee's agent in the transaction relating to the deed, the facts and circumstances reflected by the record are such as to preclude appellee's right to maintain title against the defenses interposed to the effect that deceit and imposition were used in obtaining the signatures to the deed, and that no acknowledgments were taken as required by law.

The conclusion, it seems to us, cannot be escaped that the evidence raises the issue as to whether or not appellee and J. W. Reese, whatever technical designation may be given their relations to each other in the transaction, were at least working solely for their own mutual benefit in seeking to obtain the deed. This being so, we do not think a situation is presented which shuts out attack on the notary's certificate or on any other act involved in obtaining the deed; and therefore the authorities relied upon by appellee, such as that of Ellis v. Lehman, 48 Tex. Civ. App. 308, 106 S. W. 453, do not rule this case.

Appellee contends that L. H. Reese and wife, by reason of weakness and vascillation which characterize their evidence upon cross-examination, practically destroy the effect of whatever positiveness of assertion may appear in any portion of the direct testimony given by them. It calls attention to this frailty with emphasis, and invokes the rule that a certificate of acknowledgment shall not be impeached except by clear, convincing, and cogent evidence. This rule, it contends, the strength of such testimony is insufficient to meet. It is true that on cross-examination by able counsel for appellee these two witnesses were made to say that their attitude was that they did not remember the circumstance of their son J. W. Reese, accompanied by the notary public coming to their home with the deed, and that they had no recollection as to signing a deed and acknowledging it; but, in passing upon their testimony and the weight to be given it, it must be borne in mind that they were both very old; that neither of them appears to have participated to any great extent in the affairs of men; that they were ignorant and illiterate, and unacquainted with the use of apt and subtle expressions and discriminating language. To say upon cross-examination that they did not remember was not necessarily to destroy their positive assertions upon direct examination. At least we do not think it necessarily would be unreasonable for a jury to conclude from their evidence as a whole, and all the other circumstances, that, with full understanding

of what they were doing, and with knowledge of the effect of the transaction, they did not execute the deed for the deliberate purpose on their part of conveying their homestead to appellee.

The Sunday on which the acknowledgment appears to have been taken they were at home when the notary appeared accompanied by J. W. Reece, for the purpose of taking their acknowledgment, and they had not previously been apprised (so far as the record shows) of the transaction between their son and appellee, nor had they been consulted in any way. These circumstances, in connection with the other circumstances and evidence relative to the transaction, were sufficient, we think, to raise the issue of whether or not they appeared before the notary public for the purpose of giving their acknowledgment to which the notary's certificate is attached.

[4] It is unnecessary to discuss the proposition to the effect that an antecedent debt is a sufficient consideration to support a bona fide sale of property, in view of the fact that we hold that the issue of whether the sale was bona fide was raised. Not only does the issue of whether or not the sale was bona fide inhere in the testimony as to the relation between J. W. Reese, and appellee in obtaining the deed, and the circumstances under which it was executed, but we think that the testimony of J. W. Reese while testifying as a witness for appellee to the effect that the land was to be reconveyed upon payment of $1,250 to appellee also affects the question of whether or not the transaction constituted a bona fide sale. In other words, if J. W. Reese deceived his father and mother and defrauded them into executing the deed without their knowledge of the act, then there was no sale if he bore the relation of agent to appellee, or if he and appellee were acting co-ordinately in quest of a credit upon the debt to appellee before bankruptcy, with the understanding that appellee would assist J. W. Reese to go into business for himself after bankruptcy. On the other hand, if the understanding was that the land should be reconveyed upon payment of $1,250, then the transaction would be invalid as constituting a mortgage of a homestead instead of a deed, granting that the evidence puts L. H. Reese and wife in a position to be bound at all. A transaction of this nature would not work an extinguishment of the debt but would leave it to be paid in cash upon demand (granting that the jury found L. H. Reese and wife bound at all under all the proof), notwithstanding the fact that appellee gave credit at the time on its books for $1,250. The act of thus crediting the account was not determinative of the nature and effect of the entire transaction. It was only evidence reflecting appellee's contention that the sale was absolute and unconditional.

The judgment of the court below will be reversed, and the cause remanded.